**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JANE DOE (L.M.H.), AN INDIVIDUAL, | |
| PLAINTIFF | CIVIL ACTION NO: |
| v. | |
| WYNDHAM HOTELS & RESORTS, INC., WYNDHAM HOTEL GROUP, LLC, DAYS INNS WORLDWIDE, INC., AAP REDEVELOPMENT, LLC | |
| DEFENDANTS | |

## ORIGINAL COMPLAINT

COMES NOW Plaintiff Jane Doe (L.M.H.), by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## SUMMARY

1. Jane Doe (L.M.H.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1]

3. Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation,

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] 18 U.S.C. §1591(e)(3).

lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4.     Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5.     Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6.     In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7.     As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (L.M.H.), with minimal risk of detection or interruption.

8.     Defendants continued supporting traffickers, including Jane Doe (L.M.H.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at its hotels and specifically at the Days Inn located at 2810 N. 9th St., St. Louis, MO 63147. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

**PARTIES**

9.      Jane Doe (L.M.H.) is a natural person who is currently a resident and citizen of Colorado. She was a minor until October 2017.

10.      L.M.H. is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud, or coercion, to commit a commercial sex act.

11.      Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of L.M.H.

12.      Defendant Wyndham Hotels & Resorts, Inc. is a Delaware corporation with its principal place of business in New Jersey. It can be served by its registered agent Corporate Creations Network Inc., 1521 Concord Pike, Suite 201, Wilmington, DE 19803. Wyndham Hotels & Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation. It retains successor liability for wrongful acts of its predecessor Wyndham Worldwide Corporation. All references to Wyndham in this Complaint include references to the acts and omissions of its predecessor.

13.      Defendant Wyndham Hotel Group, LLC is a Delaware company with its principal place of business in Parsippany, New Jersey. It can be served by its registered agent Corporate Creations Network Inc., 1521 Concord Pike, Suite 201, Wilmington, DE 19803. Upon information and belief, Wyndham Hotel Group, LLC is a wholly owned subsidiary of Wyndham Hotels & Resorts, Inc. and a former subsidiary of Wyndham Worldwide Corporation.

14.      Defendant Days Inns Worldwide Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. It may be served through its registered agent Corporate Creations Network Inc. at 12747 Olive Blvd., Ste. 300, St. Louis, MO 63141.

15.     Defendants Wyndham Hotels & Resorts, LLC, Wyndham Hotels & Resorts, Inc., Wyndham Hotel Group, LLC, and Days Inns Worldwide Inc. will be referred to collectively as "Wyndham," "Wyndham Defendants," or "Franchisors." Upon information and belief, they owned, operated, controlled, and/or managed the Days Inn located at 2810 N. 9th St., St. Louis, MO 63147.

16.     Defendant AAP Redevelopment, LLC is a for-profit Missouri company with its principal place of business in Missouri. It may be served through its registered agent Ankit Patel at 8711 St. Charles Rock Road, St. Louis, MO 63114. Upon information and belief, it owned, operated, controlled, and/or managed the Days Inn located at 2810 N. 9th St., St. Louis, MO 63147.

17.     Defendant AAP Redevelopment, LLC will be referred to as "Franchisee Defendant."

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district and all Defendants are residents of New Jersey for purpose of venue under 28 U.S.C. §§ 1391(c).

20.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the District of New Jersey.

21.     All Wyndham Defendants have the same principal place of business, which is in Parsippany, New Jersey, within the District of New Jersey. Corporate activities related to the operation of the subject Wyndham location occurred at this New Jersey headquarters, and

documents related to the subject Wyndham location are stored and maintained at this New Jersey headquarters.

22.     Plaintiff's claims against Franchisee Defendant arise out of its contacts with New Jersey through its franchising relationship with the Wyndham Defendants. This franchising relationship was centered at the Wyndham Defendants' principal place of business in New Jersey. Franchisee Defendant's participation in a venture with the Wyndham Defendants operating its hotel occurred, in substantial part, in New Jersey. For example:

a.  Upon information and belief, Franchisee Defendant actively sought out a franchising relationship by contacting the Wyndham Defendants in New Jersey.

b.  The franchising agreement had a choice of law provision selecting the law of New Jersey as the governing law.

c.  Franchisee Defendant agreed to resolve all disputes with the Wyndham Defendants by mediation, arbitration and/or litigation in New Jersey.

d.  Franchisee Defendant agreed to submit all notices required under the franchising agreement to the Wyndham Defendants in New Jersey.

e.  The Wyndham Defendants dictated rules and policies related to operation of the subject Wyndham location, including those related to safety, security, human trafficking, employee training and response, from their principal place of business in New Jersey.

f.  Franchisee Defendant was required to submit regular reports regarding financial performance, guest satisfaction, and operational matters to the Wyndham Defendants' corporate offices in New Jersey.

g.  The rules and policies that the Wyndham Defendants adopted required Franchisee Defendant to report information to their headquarters in New Jersey, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve, the subject Wyndham locations, including those involving sex trafficking victims.

h.  Franchisee Defendant had an ongoing obligation to participate in centralized programs operated by the Wyndham Defendants from their principal place of business in New Jersey.

i.  Franchisee Defendant utilized centralized customer feedback and complaint resolution system managed by the Wyndham Defendants from New Jersey, and the Wyndham Defendants and Franchisee Defendant coordinated efforts to analyze and respond to guest feedback.

j.  Franchisee Defendant's employees received training and operational guidelines from the Wyndham Defendants, with key training materials being developed and distributed from New Jersey, particularly in the areas of safety and anti-trafficking protocols.

k.  Reservation information for rooms at the subject Wyndham location passed through a system operated and managed by the Wyndham Defendants from their principal place of business in New Jersey.

l.  Payment information for rooms at the subject Wyndham location passed through a system operated and managed by the Wyndham Defendants in New Jersey.

m. The benefit that Franchisee Defendant received from room rentals was governed by a New Jersey franchising agreement.

n.  Each Franchisee Defendant agreed to make all payments due under the franchising agreement at the Wyndham Defendants' principal place of business in New Jersey.

o.  Franchisee Defendant's operation of the subject Wyndham location was controlled and/or influenced by many policies set and enforced by the Wyndham Defendants from their principal place of business in New Jersey.

p.  Franchisee Defendant was required to purchase insurance for the New Jersey-based Wyndham entities related to operation of the subject Wyndham locations.

23.    As a separate and additional remedy for those exploited as children, in 18 U.S.C. § 2255, Congress authorized any person who, while a minor, was a victim of a violation of 18 U.S.C.

6

§ 1591, to sue in any appropriate district court to recover damages. This provision authorizes nationwide service of process and nationwide jurisdiction. Because L.M.H. was trafficked as a minor, jurisdiction in this Court is proper under § 2255 and each Defendant is thus a resident of New Jersey for the purpose of venue.

## FACTS

**I.     Jane Doe (L.M.H.) was a Victim of Unlawful Sex Trafficking at a Hotels Owned, Operated, Managed, and Controlled by Defendants.**

24.     Jane Doe (L.M.H.) is a survivor of sex trafficking. Her trafficking began in 2014 when she was just fourteen years old after becoming a ward of the state and running away.

25.     Her trafficker controlled her through physical violence and force and made her engage in commercial sex acts for his financial benefit. Her trafficker beat her regularly and left visible bruises on her body.

26.     Her trafficker posted advertisements of her for commercial sex services online without her consent.

27.     She did not want to engage in commercial sex acts but she feared repercussions from her trafficker if she were to leave. Her trafficker engaged in a pattern of control and intimidating and threatening behavior that caused L.M.H. to believe she would face serious harm or physical restraint if she did not comply with their ongoing demand that she engage in commercial sex for their financial benefit.

28.     L.M.H. was not allowed to keep any of the money she made.

29.     L.M.H. was kept under constant surveillance during her trafficking period.

30.     Jane Doe (L.M.H.) was repeatedly trafficked in Defendants' hotel and each Defendant facilitated her trafficking.

7

31.     Between 2015 and 2017, Jane Doe (L.M.H.) was trafficked at the Days Inn located at 2810 N. 9th St., St. Louis, MO 63147. This location will be referred to as the "St. Louis Property."

32.     Staff and management at the St. Louis Property had a reasonable opportunity to observe L.M.H., who at all relevant times was a minor.

33.     Based on her appearance and general mannerisms, it was clear to hotel staff and management that L.M.H. was a minor. L.M.H. reached the age of 18 in October 2017.

34.     Jane Doe (L.M.H.)'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry.[3] These effects were obvious and apparent to the staff and management of the St. Louis Property including effects on L.M.H.'s appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Observing these effects provided Defendants with notice that L.M.H. was being continually subjected to coercion, control, and exploitation.

35.     Jane Doe (L.M.H.) remained under the continuous control of her trafficker through at least 2017.

## II.     The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

36.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Franchisor Defendants and Franchisee Defendant knew or should have known regarding the trafficking at their hotel properties, including the trafficking of Jane Doe (L.M.H.).

---

[3] *See supra* section II and accompanying footnote for discussion of "red flags" of trafficking.

37.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[4] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[5] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[6] Hotels have been found to account for over 90% of commercial exploitation of children.[7]

38.    Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

39.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[8]

---

[4] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[5] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57774091e4b0f168323a1ed7.

[6] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[7] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

[8] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

40.     Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[9]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.

---

[9] *See Id.*

10

41.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff.

42.     Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[10]  From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

43.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[11] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

44.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[12]

45.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

---

[10] Department of Homeland Security, *Blue Campaign Toolkit*,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[11] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*,
https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[12] *Id.*

11

46.     The most effective weapon against sexual exploitation and human trafficking is education and training.[13]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[14]

47.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[15]  In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

48.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

---

[13] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[14] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[15] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

49. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

### III. Sex Trafficking Has Long Been Prevalent at Wyndham Branded Properties, and Defendants Have Known About It.

50. Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (L.M.H.)'s trafficking, that sex trafficking was ongoing and widespread at Wyndham branded properties including the subject properties.

51. Unfortunately for Jane Doe (L.M.H.), the promises made by the Franchisor Defendants and Franchisee Defendant have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (L.M.H.).

### a. Sex Trafficking at Wyndham Branded Hotels was well Known by Defendants.

52. Use of Wyndham branded properties, including Days Inn properties, for sex trafficking is well known to Wyndham.

53. Upon information and belief, at all relevant times Wyndham has adopted a centralized approach to trafficking-related issues at all its branded properties. Wyndham's public statements confirm that it knew sex trafficking was a problem at its hotels and that it retained control over the response of its branded hotels to sex trafficking. Wyndham has recognized it has a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[16] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least

---

[16] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

2011.[17] However, Wyndham has refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[18]

54.     Unfortunately, while Wyndham's statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[19]

55.     The problem of sex trafficking at Wyndham properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotel staff from supporting child sex trafficking.[20] Although Wyndham publicly committed to take steps to stop facilitating trafficking, this promise proved empty; Wyndham has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[21]

56.     Sex trafficking was prominent at Wyndham branded properties, including Days Inn properties. Public information, including scores of news stories and online reviews, confirms both the widespread sex trafficking problem at Wyndham branded hotels and Defendants' knowledge and understanding of the problem.

---

[17] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[18] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023
[19] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")
[20] https://www.change.org/p/stop-wyndham-hotel-staff-from-supporting-child-sex-trafficking-in-wyndham-hotels
[21] https://endsexualexploitation.org/wyndham/

14

57. In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[22]

58. Examples of notable press involving the frequent use of Wyndham branded hotels for illegal activity, including sex trafficking at Days Inn locations across the country include:

- In July 2010, a man was arrested at a Days Inn in Metairie, LA on human trafficking charges and was accused of forcing North Carolina teens into prostitution.[23]

- In June 2011, a woman was sentenced to 9 years in prison for the sex trafficking of two 14-year-old girls. The girls were forced to work at the Days Inn in Hartford, Connecticut.[24]

- In February 2012, a man was arrested by FBI agents and members of the Human Trafficking Task Force on charges of sex trafficking of children for pimping out a 14-year-old girl who was rescued from a Days Inn in Florida.[25]

- In 2012, the first successful prosecution of a human trafficking case in Wisconsin occurred after a man trafficking a woman at a Days Inn in Wausau, Wisconsin.[26]

- Three people were arrested in July 2014 in Fayetteville on human trafficking charges after holding a woman captive at a Days Inn.[27]

- In July 2014, three people were arrested and accused of kidnapping and torturing a woman for human trafficking out of a Days Inn in Orange County, CA.[28]

- In September 2014, two Nevada residents were arrested on sex trafficking charges. Officers set up surveillance at a Days Inn in Nashville and "it did not take long for

---

[22] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

[23] Michelle Hunter, *Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution*, The Times-Picayune (July 20, 2010), https://www.nola.com/news/crime_police/man-arrested-in-metairie-on-human-trafficking-charges-accused-of-forcing-north-carolina-teens-into/article_c113df92-9046-56a1-bc02-7c065f5a9435.html.

[24] *East Hartford Woman Sentenced to 9 Years In Prison for Sex Trafficking Of Two 14-Year-Old Girls*, Hartford Courant (June 24, 2011), https://www.courant.com/2011/06/24/east-hartford-woman-sentenced-to-9-years-in-prison-for-sex-trafficking-of-two-14-year-old-girls/.

[25] Alexandra Seltzer, Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14, The Palm Beach Post (Feb. 7, 2012), https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/.

[26] Shereen Siewert, *Sex-trafficking cases hard to crack in Wisconsin*, Post Crescent (March 25, 2014), https://www.postcrescent.com/story/news/2014/03/25/sex-trafficking-cases-hard-to-crack-in-wisconsin/6884671/.

[27] Three arrested on human trafficking charges in NC, Fox8 (July 2, 2014), https://myfox8.com/news/three-arrested-on-human-trafficking-charges-in-nc/.

[28] Jeanne Kuang, Three Accused of Kidnapping, Torturing Woman for Human Trafficking in Orange County, NBC Los Angeles (July 30, 2014), https://www.nbclosangeles.com/news/three-accused-of-brutally-kidnapping-torturing-woman-for-human-trafficking-in-orange-county/65718/.

15

officers to observe heavy foot traffic in and out of that hotel room consistent with a prostitution operation."[29]

- In April 2015, a Philadelphia man was sentenced for sex trafficking minors. The man worked as a security guard at a Days Inn in Philadelphia and "provided protection and assistance to sex traffickers operating at the motel in exchange for a daily fee."[30]

- In June 2015, two Brooklyn men charged with sex trafficking allegedly forced a teenage girl into prostitution from a Long Island City Days Inn.[31]

- In July 2015, after investigating possible prostitution at a Days Inn in Maryland, Frederick County sheriff's deputies charged a Hagerstown man with human trafficking after two teenage girls were forced into prostitution.[32]

- In March 2016, a 22 year-old Sandy Springs man was arrested in Athens, Ga., and charged with pimping a person under 18 and sex trafficking after holding a 16-year-old against her will at a Days Inn in Athens and forcing her to engage in sex in exchange for money.[33]

- In March 2018, Cobb County officers arrested two individuals on charges related to pimping and keeping a place of prostitution after a runaway child tipped them off to a prostitution ring operating out of a room at a Days Inn in Marietta, Georgia.[34]

- In May 2018, eight people were arrested at a Days Inn in St. Joseph, Missouri for charges including prostitution and drug-related charges.[35]

- In June 2021, a Missouri man was arraigned on 35 criminal charges involving crimes such as rape, sodomy, sexual trafficking of a child, promoting child pornography and sexual exploitation of a minor. Among the evidence for these

---

[29] Las Vegas Man, Woman Jailed on Prostitution Charges, City of Franklin, TN (Sept. 5, 2014), https://www.franklintn.gov/Home/Components/News/News/2563/.

[30] Philadelphia Man Sentenced for Sex Trafficking Conspiracy, U.S. Attorney's Office (April 9, 2015), https://www.fbi.gov/contact-us/field-offices/philadelphia/news/press-releases/philadelphia-man-sentenced-for-sex-trafficking-conspiracy.

[31] Jackie Strawbridge, *Cuffed Brooklyn Men Allegedly Pimped At LIC Hotel*, licpost (June 9, 2015), https://licpost.com/cuffed-brooklyn-men-allegedly-pimped-at-lic-hotel.

[32] Jeremy Arias, *Hagerstown man charged with trafficking of two teenage girls*, The Frederick News-Post (July 1, 2015), https://www.heraldmailmedia.com/story/news/local/2015/07/01/hagerstown-man-charged-with-trafficking-of-two-teenage-girls/45202521/.

[33] Dyana Bagby, Sandy Springs man arrested in Athens, Ga., for sex trafficking, RoughDraft atlanta (March 24, 2016), https://roughdraftatlanta.com/2016/03/24/sandy-springs-man-arrested-athens-ga-sex-trafficking/.

[34] https://www.13wmaz.com/article/news/crime/childs-tip-leads-to-pimp-prostitution-arrests-at-cobb-county-days-inn/93-527662214

[35] https://www.newspressnow.com/news/local_news/police-arrest-eight-in-prostitution-sting/article_116325ec-0326-5afb-8828-12d12ed65602.html

16

charges were nude photographs of a minor and an adult taken in August 2020 at a Days Inn in Warrensburg, Missouri.[36]

- In November 2023, a woman was arrested for prostitution after a john attempted to shoot her in a Days Inn parking lot in York County, Pennsylvania following their sexual encounter at the hotel.[37]

59.    Ultimately, several hundred of traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of Wyndham branded properties.

60.    Similarly, Defendants knew sex trafficking was occurring at their hotels through publicly available online review websites, which are regularly reviewed by companies such as Defendants. For example, for Days Inns:

- A June 2007 Tripadvisor review from a Days Inn in Fresno, CA states "…Which leads me to note the problems with this motel--its location. Because it's close to the 99, and gets a lot of quick travelers up and down the highway, it seems to be the neighborhood to find a prostitute. During our one day stay, we saw at least 4. In the DAYTIME!! And although we weren't bothered by anyone, and the motel itself was quiet, if you've got a family you may want to skip this one."[38]

- A July 2007 Tripadvisor review from a Days Inn in Philadelphia, PA states "This was the worst place I've ever stayed in my life. I've stayed in a lot of Day's Inn that were clean, adequate rooms in a safe neighborhood. As we followed the directions we became apprehensive. When we entered the hotel lobby we knew we had made a mistake when we saw the "bullet proof glass"surrounding the front desk. With our arrival being 4th of July week we felt stuck knowing we could probably not find another room in town at 7 PM. We decided it was better to lock ourselves in a room there than to risk not finding a room elsewhere and having to spend the night in the car. I'll just say that after my one night stay here I'm not sure if I'll ever book Days Inn again! The carpet was soiled. The headboards that were supposed to be bolted to the wall was coming off. We checked out at first light assuming this would

[36] https://www.warrensburgstarjournal.com/stories/warrensburg-juveniles-among-victims-in-suspected-child-trafficking-case,63069
[37] https://www.fox43.com/article/news/crime/paid-sexual-encounter-prostitution-brittany-abosede-arrest/521-f77491fc-5171-4272-8da8-8765e2971ef9
[38] https://www.tripadvisor.com/Hotel_Review-g32414-d77021-Reviews-Days_Inn_by_Wyndham_Fresno_Central-Fresno_California.html

17

be the safest time of day to get out! Prostitutes were hanging around out front and coming in purchasing rooms. Definately not a place for a family!"[39]

- August 2008 Tripadvisor review from a Days Inn in Birmingham, AL states "Saw the website pictures and thought it looked nice and was a good value. So, I booked the room for a week. It was a mistake! It was dirty and had a lot of low life people staying there. Prostitutes, pot heads, and people wandering around all over the place. The pool was a "cess-pool". It stank, and there was a condom wrapper in it. I will NEVER stay there again"[40]

- November 2008 Expedia review from a Days Inn in Nanuet, NY states "The one thing that I will always remember about this hotel was that I had to call the front desk because a very loud and noisey pair of hookers decided to hang out in the hallway next to the exit door (which was unfortunately right near my room) while they waited for a ride to pick them up after their visit to the neighboring hotel room. They were loud and obnoxious after 10 pm while I and my family were trying to sleep. We were on a non-smoking floor and the hookers in the hallway were smoking. When we checked out the next morning we found the hallway littered with their half-eaten pizza slices and crumpled up paper cups. I had to call the front desk to complain about the noise. I don't know if it was a hotel employee or their ride who finally showed up and hustled the call-girls out of the hallway."[41]

- December 2008 Tripadvisor review of a Days Inn in Silver Spring, MD states "This was the worst hotel in my life!" "Both me an my friend are not weedy guys, but we felt unsafe staying there. At around 6pm some black guys kept hovering outside the room, then as it got later some other black guys pulled up in a car outside in the car park and where making lots of noise in there car... then other black guys would go up to the car, and then after a while walk off. Seemed like drug deals where going on in the car park! This is bad because the hotel has absolutely no (ZERO!) security. Members of the public can freely walk in and just go straight to the rooms. It felt very unsafe, so we instantly checked out and made a quick getaway! Later we found a motel 6 which was a little better but at least safer than this hotel. Other people from the area told us that if the locals notice any foreigners then we could be easy targets and they will watch us. Very unsafe. bullet proof glass in the reception, its basically like being in the bronx run down hotel. It seems that its a very cheap hotel, where the criminals, drug dealers, prostitutes use as its cheap. Dangerous for outsiders or foreigners to use. Not recommended at all. Avoid at all costs."[42]

---

[39] https://www.tripadvisor.com/Hotel_Review-g60795-d96684-Reviews-or20-
Days_Inn_by_Wyndham_Philadelphia_Roosevelt_Boulevard-Philadelphia_Pennsylvania.html
[40] https://www.tripadvisor.com/Hotel_Review-g30375-d73343-Reviews-
Days_Inn_by_Wyndham_Birmingham_West-Birmingham_Alabama.html
[41] https://www.expedia.com/Nyack-Hotels-Days-Inn-By-Wyndham-Nanuet-Spring-Valley.h172075.Hotel-Reviews
[42] https://www.tripadvisor.co.za/Hotel_Review-g41378-d84007-Reviews-or260-
Days_Inn_by_Wyndham_Silver_Spring-Silver_Spring_Montgomery_County_Maryland.html

- February 2009 Tripadvisor review of a Days Inn in Miami, FL states "…got to the hotel, which is in a seedy neighborhood. Walked into the lobby and there were six people in front of us trying to check in. There was a HOOKER working in the lobby. There was one person working plus a security guard. It was taking the receptionist 15 minutes to check in one person. We realized it would be an hour and a half to check in, we'd only get to sleep for 2.5 hours, so we got BACK in the shuttle and slept on the floor of the airport, it was that scary. Don't be fooled."[43]

- July 2010 Tripadvisor review of a Days Inn in Springfield, MO states "Hotel Staff was very friendly, but when we first went into the room there was trash under the bedskirt and a used condom laying by the night stand…Worst of all there were prostitutes staying down below us, I had to go notify staff, she comented that she wonder if that was why she was staying here and the day before we came back to the hotel from watching my son play ball and 2 women were being arrested on the stairs going up to our room. There were several homeless people hanging around the hotel for 3 of the days. I have stayed in Days Inn before and they were nice but I did not feel safe and the experience was bad so I am not sure I will stay again…"[44]

- August 2010 review from Days Inn in Norfolk, VA states "…There were many people drinking on the upper floor. We were told by a passerby that their son was offered services by prostitutes while on the premises. We left right away. Front desk staff said this hotel is safe but front desk staff will note even allow people to walk into the front desk lobby but rather communicate with people through a little hole on a confined space area about 4 x 7 room prior to entering the front desk lobby giving people a false sense of security. There were many people drinking on the upper floor and loitering. No security staff to enforce any rules. My family was frightened to stay at this inn."[45] The manager of this hotel responded to it on November 19, 2010.

- September 2010 review of a Days Inn in Milwaukee, WI states "…got back about midnight to find a pair of gentlemen bleeding in the main lobby, i later found out that they were there for a bachelor party and had found a couple "working girls" who took them out and then drugged and beat them, and the their pimp did some stuff i dont even want to repeat, regardless to say, i didnt spend the night, i left at about 3 am, checked into a hotel and absolutely would not recomment this hotel, staff and hotel are nice enough. but the manager and location are just not worth dealing with."[46]

---

[43] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html
[44] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html
[45] https://www.tripadvisor.com/Hotel_Review-g58026-d110777-Reviews-Days_Inn_by_Wyndham_Norfolk_Military_Circle-Norfolk_Virginia.html
[46] https://www.tripadvisor.com/Hotel_Review-g60097-d1571552-Reviews-Days_Inn_Suites_by_Wyndham_Milwaukee-Milwaukee_Wisconsin.html

- June 2011 Expedia review of a Days Inn in San Jose, CA states "NOT SAFE PLACE TO STAY OR BRING YOUR FAMILY. Nothing was clean, swimming pool was not usable, there were blood stains on the sheets, no customer service.~~Worst of all, there were drug deals there all the time as well I was propositioned for sex as someone thought I "worked there" Please do not stay here if you want to feel safe"[47]

- January 2012 review from a Days Inn in Lawndale, CA states "… it felt super unsafe lie kinda place that hookers, pimps, gens, & drug dealers frequent. … I would never stay here again. this place is a motel! worth only about $25 a night. its no good unless u just need four walls and bed to sleep in for a night."[48]

- March 2012 review from a Days Inn in New Stanton, PA states "…Sketchy men are inside their truck smoking and hanging out in the parking lot. Men start ogling me and eying me in a creepy, sketchy way and my coach and her husband (both are cops) make a comment about a young woman who is scantly clad and walking with a man in his sixties arm in arm. The son makes a comment that a business transaction was going on and this was a prostitute and a john!" "So, I know that they got rid of my room, because they would rather charge a desperate pervert a higher rate so that he could pay for sex, then an athlete with a lower rate. I argue with the two people at the front desk and get into a shouting match and then five sketchy men stand right near the front desk staring there even after he said that the hotel was booked full…"[49]

- June 2012 review from Das Inn in Atlantic City, NJ states "…when I came back to my hotel I was greeted by to atlantic city prostitutes walking out of the lobby with the european looking fellow. At the lobby the hotel has a $10 per guest policy I suppose as a way of making commissions. Lol. Uuuugh.for the price I paid I should have expected as much and not been as naive but I won't be making that mistake again."[50]

- October 2012 Yelp review of a Days Inn in Sarasota, FL states "Great hotel - if you enjoy being propositioned by prostitutes. Skid row's "finest." A real DUMP."[51]

- January 2013 review from Days Inn in Copiague, NY states "I would not wish this place on my worst enemy. The room smelled like a dead body and they tried to cover it up with Lysol. I let them know that I tried to air the room out for 20 minutes and it did not help. They moved me to the room next door and it was the same thing.

---

[47] https://www.expedia.com/San-Jose-Hotels-Days-Inn-By-Wyndham-San-Jose.h18108.Hotel-Reviews
[48] https://www.tripadvisor.ca/Hotel_Review-g32612-d84227-Reviews-Days_Inn_by_Wyndham_Los_Angeles_Lax_Redondo_ManhattanBeach-Lawndale_California.html
[49] https://www.yelp.com/biz/days-inn-by-wyndham-new-stanton-pa-new-stanton
[50] https://www.yelp.com/biz/days-inn-by-wyndham-atlantic-city-oceanfront-boardwalk-atlantic-city
[51] https://www.yelp.com/biz/days-inn-by-wyndham-sarasota-bay-sarasota

There were all kinds of ghetto trash hanging around my car when I was leaving and the place seemed like a party/hooker hotel based on the people hanging around there."[52]

- January 2013 review of Days Inn in Miami, FL states "Our television didn't work, the walls and tub had stains all over them, and there were hookers and their pimp hanging out waiting for johns on the top floor of the outside rooms overlooking the parking lot. When we complained it was obvious that some of the staff obviously knew what was going on with the prostitution. However the staff we dealt with did try to accomodate us by giving us another room on the inside of the hotel, but it was still filthy."[53] A guest relations manager responded to this review on February 4, 2013.

- March 2013 review of a Days Inn in Monroeville, PA states "jenny calderlore (manager) u are failing at making this hotel a success ur neglect and lack of responsibility has turnd me and buisness partners off we will never use this shack again we areas more then the twobit nite people (prostitutes and drug abusers) that use ur facility i will never consider ur hotel again!"[54]

- April 2013 review of a Days Inn in Alexandria, VA states "…Everything is true about the drug activity, prostitutes, across the street is section 8 housing with loud music and lots of "traffic" to one house in particular…Safety is definitely a concern.. I parked my car one night after partying in DC and a bum knocked on my window asking for change. The police have come a few nights driving through the area asking is everything okay. One officer referred to the area as the "problem area"."[55] A guest relations manager responded to this review on April 7, 2013.

- May 2013 review of a Days Inn in Kent, WA states "…During this wait is when we witnessed the worrying stuff. We got the impression that most of the other motel guests lived there. There were guests in and out asking the desk if they had messages who either looked really disheveled or like a prostitute. Some of them knew each other. There was one woman checking in. The employee at the counter told her that if she had any "guests" she would be asked to leave..clearly there was a history. I wrote all this off to my imagination..until a police officer came in. He talked to the staff about their ongoing problems with prostitution and drugs and was offering his help and advice..the staff told him about the people living in their van and car in the parking lot. There were three police cruisers in the parking lot for awhile after that."[56]

---

[52] https://www.tripadvisor.ca/Hotel_Review-g47533-d1176402-Reviews-Days_Inn_by_Wyndham_Long_Island_Copiague-Copiague_Long_Island_New_York.html

[53] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html

[54]

[55] https://www.tripadvisor.co/Hotel_Review-g30226-d83887-Reviews-Days_Inn_by_Wyndham_Alexandria-Alexandria_Virginia.html

[56] https://www.tripadvisor.com/Hotel_Review-g58537-d216846-Reviews-Quality_Inn_Kent-Kent_Washington.html

- July 2013 review of a Days Inn in Louisville, KY states "I could not believe how bad this place was. The room was nasty, I was afraid to put my 8 month old down! The tub was stained and there were "hairs" in the tub. Not only was the room bad but so was the area..we had prostitutes working from the sidewalk outside our door! We checked out and went to another hotel down the road."[57] The hotel manager responded to this review on July 12, 2013.

- July 2013 review from Days Inn in Corpus Christi, TX states "…I honestly felt that some sort of prostitution was taking place on premises. I can think of no other explanation for the constant activity between midnight and 5:00 a.m. No iron in the room. Hallways smelled like the place had been in a flood. after the first night my son's legs boke out in a rash. The worst hotel experience ive ever had. Definitely not worth $476."[58]

- September 2013 review from a Days Inn in Dallas, TX states "…The hotel is used mainly by prostitutes and drug dealers. It was a last minute decision on my part, due to a change in my work plans. At least I didn't find bed bugs... Wifi only worked in the lobby, false advertising on the hotel's part.... Employees there (front desk clerk and housekeeping) were very unfriendly and not helpful. overall, the worst experience with a hotel, ever. I'm upset that I paid for such crappy service and room."[59] A guest relations manager responded to this review on September 24, 2013.

- January 2014 review from a Days Inn in Beaumont, TX states "Let's see, moldy smell in room? Check. Mildew around tub? Check. Hastily painted over black mold on the wall? Check. Look on my wife's face when a hooker knocks on the door at 2 AM.? Priceless!"[60]

- February 2014 review from a Days Inn in Saint Paul, MN states "…However, when my companions and myself (three women total) went down to the bar for a drink we were propositioned.I had security remove this man. But within a short period of time he was back again harssing us. I did find out from a family member whom we were visitng that this hotel was busted for a prostitution ring. Well, that was not on the description of the hotel that I read! Had I known this we would have stayed elsewhere."[61]

- April 2014 review of a Days Inn in North Charleston, SC states "…We will NEVER stay here again. The first two nights the people next door argued and yelled half the

[57] https://www.tripadvisor.com/Hotel_Review-g39604-d295278-Reviews-Days_Inn_by_Wyndham_Louisville_Airport_Fair_and_Expo_Center-Louisville_Kentucky.html

[58] https://www.expedia.com/Corpus-Christi-Hotels-Days-Inn-Suites-By-Wyndham-Corpus-Christi-Central.h43249.Hotel-Reviews

[59] https://www.tripadvisor.co.nz/Hotel_Review-g55711-d109479-r368180294-Days_Inn_Suites_by_Wyndham_Dallas-Dallas_Texas.html

[60] https://www.yelp.com/biz/days-inn-by-wyndham-beaumont-beaumont

[61] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Quality-Inn-St-Paul-Minneapolis-Midway.h20646.Hotel-Reviews

night. Think a hooker and her pimp because people kept coming in and out all night, ridiculous."[62]

- May 2014 review of a Days Inn in Lanham, MD states "This hotel seems highly trafficked by young adults and/or those using said hotel rooms for sex/prostitution purposes. There was also a lot of screaming and cursing amongst the guests staying at hotel, with very little intervention from night staff."[63]

- July 2014 review of a Days Inn in Columbia, SC states "This place is a dump!! Not a safe place to stay with your family. Hooker's walking around, high speed chase, and drug dealing in front of my room!!! Do Not waste your money!!!"[64]

- July 2014 review of a Days Inn in Savannah, GA states "…Friday night I get woke up by drunk guest in the court yard. 1 am . I go to get something from the car there is 2 prostitutes offering sex for money in the drive way to a group of men getting drunk in the driveway. I decide to get stuff from the vending machines, I couldn't buy a candy bar but you could by condoms…"[65]

- September 2014 review of a Days Inn in Springfield, MO states "Worse hotel ever the room smelt like dirty feet, drug deal in the parking lot. A hooker trying to get my son to come to her room people knocking at your door all hours of the night. Then they took an $101 for charges and told me the room smelt like cigarettes.I dont smoke. So now I'm fighting with corporate office to get back my $101."[66] The hotel manager responded to this review on October 20, 2014.

- February 2015 review of a Days Inn in Alexandria, VA states "…Also when I was checking out, there was a lady who seemed to be a prostitute as she was wearing tight pants, and she checked in in the afternoon and checked out at night and didn't want her security deposit. Very shady area…"[67]

- March 2015 review of a Days Inn in Monroeville, PA states "In town for my mothers funeral. Hotel had prostitutes solicit my husband on elevator, rotten apples on breakfast bar, dirty rooms, poor internet connection, bad customer service.

---

[62] https://www.expedia.com/Charleston-Hotels-Days-Inn-Suites-By-Wyndham-Charleston-Airport-West.h11774.Hotel-Reviews

[63] https://www.tripadvisor.com/Hotel_Review-g41222-d217008-Reviews-Days_Inn_by_Wyndham_Lanham_Washington_D_C-Lanham_Maryland.html

[64] https://www.yelp.com/biz/days-inn-and-suites-by-wyndham-se-columbia-ft-jackson-columbia

[65] https://www.tripadvisor.com/Hotel_Review-g60814-d89795-Reviews-or660-Days_Inn_Suites_by_Wyndham_Savannah_Gateway_I_95_and_204-Savannah_Georgia.html

[66] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html

[67] https://www.tripadvisor.co/Hotel_Review-g30226-d83887-Reviews-Days_Inn_by_Wyndham_Alexandria-Alexandria_Virginia.html

Overall terrible experience and waste of money. Stay at the RED ROOF INN down the street."[68] The hotel manager responded to this review on March 9, 2015.

- April 2015 review of a Days Inn in Pinole, CA states "…while I was sitting and eating I notices a local hooker walk in and ask the clerk to call a room for her, she had a conversation with the person staying there ( a customer who changed their mine) then she had the some one to pick her up from the front desk office phone. never again I repeat."[69]

- July 2015 review of a Days Inn in Philadelphia, PA entitled "WEED, PROSTITUES, AND THE HOMELESS DERELICS" states "there were prostitutes, drug addicts and dealers who frequented the building during my THREE DAY STAY, our neighbors across the hall had a party every night with different guests each night and were loud as heck, there was a strong odor of marijuana coming from almost every room on the second floor, the security guard sits in the lobby and only walks the floors every so often when he isn't sleep in the chairs and even though he can definitely smell the marijuana, he says and does NOTHING.!!!!"[70] The guest relations manager responded to this review on July 31, 2015.

- November 2016 review of a Days Inn in Atlantic City, NJ states "…Upon arrival you could see the hotel was out dated and either the employees or guests where smoking weed due to the lobby reeking of it. once we got up to our floor the smell of weed was overwhelming and the hallways were smokey…the tv had what we presumed was Vaseline smeared on the buttons so we refused to touch it or use it…while i was down stairs i asked the front desk if our floor was a smoking floor. he told us no but you can smoke on the balcony. i informed him the floor we where on was filled with smoke and the smell of weed. he told us to tuck towels under the door and that people smoke on the balcony and the smoke comes inside. i told him we already did and this is more than a "little" smoke. he then told us if we dont like it we can go someplace else with a smirk on his face.when we got back to our room there was a women screaming and yelling at a guy in the next room to pay her for her "services". i didn't bother to call the front desk seeing as how they dont care people do drugs in their hotel im sure they dont care a hookers yelling at her john. Lastly when leaving the hotel we got in our car and the rude desk clerk that told us to go someplace else got out of his car and stared me and my girlfriend down shaking his head still with that smirk on his face. My advise for anyone planning on staying here is DO YOUR RESEARCH and be sure to document whats in the

---

[68] https://www.tripadvisor.com/Hotel_Review-g53223-d20224435-Reviews-or270-Rodeway_Inn_Suites_Monroeville_Pittsburgh-Monroeville_Pennsylvania.html
[69] https://www.expedia.com/Concord-Hotels-Days-Inn-By-Wyndham-Pinole-Berkeley.h41602.Hotel-Reviews
[70] https://www.tripadvisor.com/Hotel_Review-g60795-d96684-Reviews-or20-Days_Inn_by_Wyndham_Philadelphia_Roosevelt_Boulevard-Philadelphia_Pennsylvania.html

room before and after you leave. this hotel seems to harbor drug users and prostitution so be advised if you are bringing children here."[71]

- January 2017 review of a Days Inn in Beaumont, TX states "Stay was horrible rooms were some what clean how ever I had drug deals being done out side room could hear every word being said outside my door and the local hookers knocked on door twice that night as well as the tenants up stairs throwing sledge hammers off the balcony into the parking lot as a challenge of some sort"[72] The general manager of the hotel responded to this review on January 8, 2017.

- February 2017 review of a Days Inn in Reynoldsburg, OH states "There was the smell of marijuana in the halls on a daily basis and office was informed and yet it still continued as with the prostitution"[73]

- April 2018 review of a Days Inn in Albuquerque, NM states "Prostitutes were screaming the same script of seriously gross stuff every 45 minutes. I don't know if I've been as scared as I was that night.. the cops finally came at 4AM, but as soon as they left, it was full steam ahead again. Never stay here, the owning company Wyndham Hotel Group responded to me by saying they appreciate feedback. Nothing is going to change until someone holds them accountable."[74]

- August 2018 review of a Days Inn in Antioch, CA states "Drug dealers talking on the phone in pool area, hookers being dropped off and picked up, tweekers rummaging through cars. Had to keep my kids in the room the whole time. No orange juice, or milk for " breakfast". Horrible."[75]

- January 2019 review of a Days Inn in Birmingham, AL states "The hotel was not in a great location and also where my room was located a lot of prostitution was taking place"[76] The hotel manager responded on February 2, 2019 stating "…We respect each guest therefore, we do regret that the ambiance or the other guests were not according to your preferences, but we honor them all and value each of them…"

- May 2019 review of a Days Inn in Greenville, SC states "Worst place ever the manager is rude. The rooms are nasty. I will bever stsy here again there are hookers all over and the staff dont care. There are ppl doing drugs right out in the open. Ppl selling drugs right out in the open. I had my kids here will never stay st this place

[71] https://www.tripadvisor.co/Hotel_Review-g29750-d92281-Reviews-Days_Inn_by_Wyndham_Atlantic_City_Oceanfront_Boardwalk-Atlantic_City_New_Jersey.html
[72] https://www.tripadvisor.com/Hotel_Review-g60737-d483228-Reviews-Days_Inn_by_Wyndham_Beaumont-Beaumont_Texas.html
[73] https://www.tripadvisor.com/Hotel_Review-g50891-d75114-Reviews-Days_Inn_Suites_by_Wyndham_Columbus_East_Airport-Reynoldsburg_Ohio.html
[74] https://www.yelp.com/biz/days-inn-by-wyndham-midtown-abq-albuquerque?start=80
[75] https://www.expedia.com/Concord-Hotels-Days-Inn-Suites-By-Wyndham-Antioch.h1195456.Hotel-Reviews
[76] https://www.expedia.com/Birmingham-Hotels-Days-Inn-By-Wyndham-BirminghamWest.h14316.Hotel-Reviews

agsin"[77] The general manager of the hotel responded to this review on May 13, 2019.

61.     This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (L.M.H.) was trafficked at the St. Louis Property, the Wyndham Defendants knew or should have known that:

   a.   There was widespread and ongoing sex trafficking occurring at Wyndham branded properties.

   b.   Sex trafficking was a brand-wide problem for Wyndham originating from management level decisions at their corporate offices in Parsippany, NJ.

   c.   Wyndham franchisee and hotel staff were not taking reasonable steps to identify and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

   d.   Wyndham's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

   e.   Wyndham and its franchisee were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

62.     Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Wyndham continued to earn revenue by continuing conduct that they knew or should have known facilitated sex trafficking.

**b.  Wyndham Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the subject hotels.**

63.     Wyndham Defendants were specifically aware that sex trafficking was widespread and ongoing at the subject hotels.

64.     Internet reviews for the St. Louis Property, which upon information and belief the Wyndham Defendants managed and monitored, show the pervasiveness of sex trafficking before and well after Jane Doe (L.M.H.) was trafficked. For example:

---

[77] https://www.tripadvisor.com/Hotel_Review-g54258-d223932-Reviews-Days_Inn_by_Wyndham_Greenville-Greenville_South_Carolina.html

- 2015 TripAdvisor review states "There were people drinking in the parking lot and smoking drugs in the hallways. You could smell the marijuana smoke when you walked in the door…. We were offered drugs in the parking lot and were worried about our safety there."[78]

- 2015 TripAdvisor review states "…The desk clerk advised us not to leave the facility on foot, not even in the day time… watched drug dealers all night through window…"[79]

- 2015 TripAdvisor review states "Filthy, blood stains on the bed covers, dirty laundry and lotions under the bed, prostitutes in the halls, no attendant in the lobby, way over priced for a run down hotel that is so close to so many nice hotels…"[80]

- 2017 Google review states "do not book this hotel........scary neighborhood...you might get shot! drug deals going down in the parking lot as we were getting ready to check in!..."[81]

- 2018 Expedia review states "…Other than the hooker standing at the front door when we returned from the game and the comforter everything else was good."[82] This review elicited a response from a monitor.

- 2018 TripAdvisor review states "Shady area and hotel, Rooms were not clean. Patrons look like prostitutes…"[83]

- 2019 TripAdvisor review states "…To start it off while checking in, the entire lobby smelled like body odor and marijuana. While taking the elevator up to my room I noticed the entire elevator smelled like urine, and continued to do so for the next five days. To top it off I had to witness an individual drag a female through the hallway because she had just overdosed off of presumably heroin…"[84]

---

[78] https://www.tripadvisor.com/Hotel_Review-g44881-d91045-Reviews-Days_Inn_by_Wyndham_Downtown_St_Louis-Saint_Louis_Missouri.html

[79] Id.

[80] Id.

[81] https://www.google.com/travel/hotels/Days%20Inn%202810%20N%209th%20St,%20Saint%20Louis,%20MO%2063147/entity/CgsIne_r2e7PwYnOARAB/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4308227,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4879519,4886082,4886480,4893075,4902277,4905351,4906023,4906050,4920622,4926165,4926489,4927883,4927885,4934308,4934345,4936396,4937896,47061553&hl=en-CA&gl=ca&ssta=1&q=Days+Inn+2810+N+9th+St,+Saint+Louis,+MO+63147&grf=EmQKLAgOEigSJnIkKiIKBwjnDxABGB8SBwjnDxACGAIgADAeQMoCSgcI5w8QARgZCjQIDBIwEi6yASsSKQonCiUweDg3ZGY0Y2QzNGY5OTA2MDE6MHhjZTEzMDY3ZWViM2FmNzlk&rp=EJ3v69nuz8GJzgEQne_r2e7PwYnOATgCQABIAcABAg&ictx=1&sa=X&ved=2ahUKEwiyuLTCtOT8AhVRNsAKHaRJA1oQ4gl6BAhvEAU

[82] https://www.expedia.com/St-Louis-Hotels-Days-Inn-By-Wyndham-Downtown-St-Louis.h2418962.Hotel-Reviews

[83] https://www.tripadvisor.com/Hotel_Review-g44881-d91045-Reviews-Days_Inn_by_Wyndham_Downtown_St_Louis-Saint_Louis_Missouri.html

[84] Id.

27

- 2019 TripAdvisor review states "…It was loud and you can hear drug transactions and partying in nearby rooms, not to mention sex it's screaming babies. The hallway smell like urine and alcoholic beverages oh, my family just decided to sleep in your car because it was so late at night. Once we reach the parking lot there were what I supposed to be crackheads trying to look in every car they could find trying their best to get inside either to take a nap going to urinate…"[85]

- 2020 Booking.com review states "…They sale drugs out of there and it's not safe for customer to be there. People sleeping on the couch when you come through the door. very unhappy. The room were not cleaning at all. I had to change room two time. First I had 109 had panties in the room hair on the lamp the room were not clean at all…"[86]

- 2020 Booking.com review states "…I found hyper dermic needlesand used condoms in my room"[87]

- 2020 Booking.com review states "…the all night hollering, screaming and sex parties banging the walls all night long, need I go on???? Bad part of town too. I will never stay at this Days Inn again."[88]

- 2020 Expedia review states "…upon entering there were condom rappers on the floor and empty liquor bottles…"[89]

- 2020 TripAdvisor review states "This location is very bAd lots of drugs traffic… in a bad area with high crime."[90]

- 2020 TripAdvisor review states "Place is a dump! The locals keep this place in business. Everyone in there was higher than than the St Louis Arch! Walked into room to and found ashes on the ice bucket tray in a non smoking room. We turned around and walked out. I demanded my money back and left.

- 2020 TripAdvisor review states "There was even a hooker standing in the lobby wearing a skin tight yellow bunny suit. Prostitution and drugs keep this place open. Wyndham should be ashamed to have this property part of their portfolio. Fenced off parking lot and bullet proof glass around the front desk should have been my que. Dont stay here!!!!"[91]

---

[85] Id.
[86] https://www.booking.com/hotel/us/days-inn-downtown-st-louis.fr.html
[87] Id.
[88] Id.
[89] https://www.expedia.com/St-Louis-Hotels-Days-Inn-By-Wyndham-Downtown-St-Louis.h2418962.Hotel-Reviews
[90] https://www.tripadvisor.com/Hotel_Review-g44881-d91045-Reviews-Days_Inn_by_Wyndham_Downtown_St_Louis-Saint_Louis_Missouri.html
[91] Id.

- 2021 Booking.com review states "…The hotel was disgusting! Blood on the floor, ceilings, and our sheets! It is nothing but prostitutes and drugs!.."[92]

- 2021 Booking.com review states "…someone knocked on my door looking for a prostitute…"[93]

- 2021 Booking.com review states "Manager is rude hotel for prostitution and drug use dirty rooms and beds that have not been changed…"[94]

- 2021 Booking.com review states "…Prostitutes everywhere…"[95]

- 2021 Expedia review states "The hotel had hookers and people all drugged up walk in a around property… he hotel is located bad part of town all abandoned buildings to traffic what so ever only the hookers and the Johns and people looking and doing drugs…"[96]

- 2022 Booking.com review states "…On the tabke near the window is where i found Marijuana stems or whatever they are called. You can smell smoke soon as you entered the room. My child found cigar papers… I complained too front desk and she starred at me like she didn't want too here it. This is not a place for children too stay. There is so much traffic in and out of this place…i believe this is a prostitution facility.."[97]

- 2022 Expedia review states "This hotel was deplorable. It was more like a pimp hotel with people coming in and staying a few hours and leaving. Noise coming from the rooms all hours of the night…"[98]

65.    Traffickers, including Jane Doe (L.M.H.)'s trafficker, repeatedly chose to use the subject hotels for their sex trafficking activity. As such, Defendants also knew or should have known about the pervasive sex trafficking at the hotels based on obvious indicators of this activity.

66.    Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the St. Louis Property prior to Jane Doe (L.M.H.)'s trafficking who exhibited "red flags" of trafficking that were observed by

---

[92] https://www.booking.com/hotel/us/days-inn-downtown-st-louis.fr.html
[93] Id.
[94] Id.
[95] Id.
[96] https://www.expedia.com/St-Louis-Hotels-Days-Inn-By-Wyndham-Downtown-St-Louis.h2418962.Hotel-Reviews
[97] https://www.booking.com/hotel/us/days-inn-downtown-st-louis.fr.html
[98] https://www.expedia.com/St-Louis-Hotels-Days-Inn-By-Wyndham-Downtown-St-Louis.h2418962.Hotel-Reviews

29

hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

67. All knowledge from the staff at the hotels is imputed to Wyndham. Wyndham knew about this widespread and ongoing trafficking at the hotels, including the trafficking of Jane Doe (L.M.H.), through the direct observations of hotel staff, including management-level staff.

68. Upon information and belief, Wyndham knew or should have known about widespread and ongoing trafficking activity at the hotel property because of non-public information available because Wyndham:

   a. conducted regular inspections of the hotel property;

   b. employed "field agents" to work with hotels on trafficking issues;

   c. publicly represented that it monitored and audited hotels to determine the status of anti-trafficking efforts;

   d. required franchisee and hotel staff to report suspected trafficking activity to Franchisor;

   e. was involved in day-to-day consulting on operational issues at hotel;

   f. had access to surveillance systems;

   g. collected and monitored data that showed patterns consistent with trafficking;

   h. participated in internal investigations;

30

i.    solicited and received customer feedback and complaints;[99]

69.    Upon information and belief, under the Wyndham Defendants' protocols, which on their face required hotel staff and management to report suspected criminal activity to the Wyndham Defendants, hotel staff and management were required to report numerous instances of suspected sex trafficking to the Wyndham Defendants prior to Jane Doe (L.M.H.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the subject Wyndham properties.

70.    Upon information and belief, Wyndham adopted a protocol that, on its face, required hotel staff and franchisees to report suspected criminal activity, including suspected prostitution and sex trafficking, to Wyndham. Based on the existence of this protocol and the widespread and obvious trafficking at the subject properties, there were multiple instances of suspected sex trafficking that were or should have been reported to Wyndham.

71.    Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham-branded hotels, and at the subject hotels, Wyndham and the Franchisee Defendant each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the St. Louis Property and to make a reasonable investigation in response to signs of potential sex trafficking. If Wyndham and the Franchisee Defendant had used reasonable prudence, they would have been aware of the widespread and ongoing trafficking at the St. Louis Property and that they were benefiting from such trafficking.

---

[99] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("In every case, Wyndham received the guest complaint, monitored the response, and tried to placate disgruntled guests with Wyndham Rewards hotel points.")

72.     Wyndham and the Franchisee Defendant had constructive knowledge of the widespread and ongoing trafficking at the property because this trafficking resulted from their failure to exercise ordinary care operating the hotel.

**c.  Defendants knew Jane Doe (L.M.H.) was being trafficked at the St. Louis Property because of the apparent and obvious "red flags" of sex trafficking.**

73.     During the period that Jane Doe (L.M.H.) was trafficked at the St. Louis Property, there were obvious signs that her traffickers were engaged in sex trafficking:

    a.  At check in, hotel staff observed Jane Doe (L.M.H.)'s trafficker enter the hotel alone and book more than one room at a time to accommodate the multiple victims he was trafficking.

    b.  Hotel staff would have observed Jane Doe (L.M.H.) with few or no personal items, appear to be malnourished and/or have poor hygiene, and appear emotional, nervous, and scared.

    c.  The hotel rooms in which Jane Doe (L.M.H.) was trafficked were frequently paid for with cash or prepaid cards.

    d.  Hotel staff would have observed Jane Doe (L.M.H.), a minor, high on drugs and alcohol while on the hotel property.

    e.  Hotel staff would have observed Jane Doe (L.M.H.), a minor, staying on the property with her trafficker who was visibly significantly older than her.

    f.  L.M.H. appeared consistent with her age of 15 years old when trafficking first began at the St. Louis Property and it was apparent to hotel staff that she was a minor.

    g.  L.M.H. wore provocative, revealing clothing that was not appropriate for her age.

    h.  Other females were being trafficked with Jane Doe (L.M.H.) by her same trafficker at the St. Louis Property.

    i.  Jane Doe (L.M.H.), a minor, stayed at the St. Louis Property on multiple occasions, often during school hours.

    j.  The "Do Not Disturb" door hanger was used very frequently.

32

k. L.M.H. requested extra towels and linens from housekeeping but would often deny staff entry into the room. Hotel staff observed that she was dressed provocatively and was emotional, nervous, and scared.

l. Jane Doe (L.M.H.)'s trafficker would post ads for her services on the internet using the hotel's Wi-Fi. In March 2015, L.M.H.'s ad stated that she was at the St. Louis Property.

m. Several johns entered and left Jane Doe (L.M.H.)'s room at unusual hours and were present at the hotel for brief periods of time.

n. There was heavy foot traffic in and out of Jane Doe (L.M.H.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

o. After Jane Doe (L.M.H.) checked out, hotel cleaning staff would have noticed sex paraphernalia like condom wrappers and lubricant in the room.

p. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

74. Based upon information and belief, multiple employees at the St. Louis Property, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

75. As such, Defendants knew or were willfully blind to the fact that Jane Doe (L.M.H.) was being trafficked at the St. Louis Property.

76. Given these obvious signs, Wyndham Defendants knew or should have known about the trafficking of Jane Doe (L.M.H.) based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

77. Defendants also knew or should have known about Jane Doe (L.M.H.)'s trafficking based on the other methods, listed above, that they used to monitor and supervise the subject properties.

78. Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham-branded hotels, and at the St. Louis Property, Wyndham and the Franchisee Defendant

33

each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject hotel and to make a reasonable investigation in response to signs of potential sex trafficking. If Wyndham and the Franchisee Defendant had used reasonable prudence, they would have been aware of Jane Doe (L.M.H.)'s trafficking at the subject hotel and that they were benefiting from such trafficking.

## IV.    Defendants actively facilitated sex trafficking at the St. Louis Property, including the trafficking of Jane Doe (L.M.H.)

79.    Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (L.M.H.) at the St. Louis Property because the trafficking was the direct result of Defendants facilitating her trafficking at the property.

### a.    Franchisee Defendant facilitated the trafficking of Jane Doe (L.M.H.) at the St. Louis Property.

80.    Franchisee Defendant is responsible for the acts, omissions, and knowledge of all employees of the St. Louis Property when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Franchisee Defendant ratified these acts and omissions, and because Franchisee Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee Defendant, of sex trafficking occurring at Wyndham properties including the subject location.

81.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the St. Louis Property, Franchisee Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including Jane Doe (L.M.H.).

82.    Franchisee Defendant knew or was willfully blind to the fact that Jane Doe (L.M.H.) was being trafficked and, despite this, benefited from continued association with her

34

trafficker by providing him a venue in the form of hotel rooms and related services, to facilitate Jane Doe (L.M.H.)'s sexual exploitation.

83.    Franchisee Defendant also facilitated widespread trafficking at the St. Louis Property, including the trafficking of Jane Doe (L.M.H.), in ways including:

a.  developing relationships with traffickers, including L.M.H.'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

b.  continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of L.M.H. and other victims;

c.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

d.  inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

e.  failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

f.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff; and

g.  accommodating specific requests made by traffickers.

84. Franchisee's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including L.M.H.

85. Franchisee knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

86. Policies purportedly enacted and enforced by Wyndham Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the St. Louis Property by neither Wyndham Defendants nor Franchisee. L.M.H.'s trafficker was able to continue the trafficking venture at the St. Louis Property. Had the Wyndham Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing obvious signs of trafficking as described above, L.M.H.'s trafficking would have been identified and reported, which would have prevented her trafficking at the St. Louis Property. Furthermore, had Franchisee Defendant properly followed the franchise policies enacted by the Wyndham Defendants to identify and prevent trafficking from occurring at branded hotels as described above, L.M.H.'s trafficking would have been identified and reported, which would have prevented her trafficking at the St. Louis Property.

**b.    Wyndham Defendants facilitated the trafficking of Jane Doe (L.M.H.) at the St. Louis Property.**

87. Upon information and belief, the Wyndham Defendants participated directly in aspects of the operation of the St. Louis Property that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Jane Doe (L.M.H.), as follows:

36

a. assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

b. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor;

c. assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

d. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e. employing field-based associates who work with the hotel on trafficking issues;

f. assessing or auditing the hotel property, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g. establishing systems for guests to report security issues to franchisor;

h. requiring franchisee to provide Wi-Fi/internet access to guests;

i. mandating the specific tools and systems that franchisee must use to provide Wi-Fi/internet access to guests;

j. setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

k. requiring franchisee to use a system to monitor and track housekeeping requests;

l. setting policies for when and how housekeeping services are provided;

m. collecting and monitoring data that shows patterns of use of housekeeping services;

n. setting policies for when and how hotel staff can accept tips.

88. Wyndham Defendants directly participated in and retained day-to-day control over renting rooms at the St. Louis Property by, among other things:

a. controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

37

b.  controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

c.  requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

d.  reserving rooms and accept payments without requiring franchisee approval or involvement;

e.  controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

f.  requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

g.  requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

h.  requiring the franchisee to use a property-management system operated and controlled by the franchisor;

i.  requiring the franchisee to use a data-management system operated and controlled by the franchisor;

j.  ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

k.  exercising control over the price of rooms;

l.  controlling all details of the customer loyalty program that the franchisee was required to implement;

m. setting detailed policies for the check-in process, including requirements for identification and payment methods;

n.  collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

o.  assuming sole ownership over all guest information;

p.  overseeing do not rent (DNR) lists for its branded properties.

89. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the St. Louis Property, Wyndham Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (L.M.H.).

90. Wyndham Defendants knew or should have known that Jane Doe (L.M.H.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing him hotel rooms and related services to facilitate Jane Doe (L.M.H.)'s sexual exploitation.

91. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the St. Louis Property, the Wyndham Defendants continued participating in a venture at that hotel, with its franchisee and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following:

    a. adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

    b. adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

    c. adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

    d. adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

    e. providing traffickers continued access to Franchisor-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

    f. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at subject Days Inn;

39

g. implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

92. But for the Wyndham Defendants' failure to exercise ordinary diligence when operating and controlling the St. Louis Property, including when exercising control over staff training and response to suspected criminal activity on property, they would have known that L.M.H. was being trafficked there. Thus, constructive knowledge of L.M.H.'s trafficking is imputed to the Wyndham Defendants.

93. If Wyndham had exercised reasonable diligence when operating the Wyndham properties and in the areas where it retained control, Wyndham would have prevented the Wyndham properties from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (L.M.H.). Instead, Wyndham engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (L.M.H.).

## V.    Defendants' ventures at the St. Louis Property.

94. Each of the Wyndham Defendants generated substantial income from the St. Louis Property, receiving a share of the profits from room rentals collected at the hotel. The fees generated by the Wyndham Defendants were primarily based on gross room rentals; therefore, the Wyndham Defendants' profits increased with each room rental at the St. Louis Property, including each room rented to a trafficker. Revenue generated from rooms rented at the St. Louis Property was distributed among the Wyndham Defendants, with each benefiting from each rental of a hotel room to a trafficker, including L.M.H.'s trafficker.

95. Franchisee profited from every room rented to a trafficker or for use in trafficking at the St. Louis Property, both from the room fee and from fees for other hotel services.

96. In ways described more fully above, the Wyndham Defendants and Franchisee knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship and implicit understanding, the population of sex traffickers operating out of the St. Louis Property, including L.M.H.'s trafficker. (hereinafter "Venture 1").

97. The Wyndham Defendants and Franchisee formed this continuous business relationship and implicit understanding with the traffickers at the St. Louis Property by continuing to rent rooms to be used for trafficking (including L.M.H.'s trafficking) after the Wyndham Defendants and Franchisee knew or should have known that the rooms were being used for unlawful trafficking.

98. This business relationship involved mutual pursuit of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and the Wyndham Defendants and Franchisee were generating revenue by renting the hotel rooms.

99. This implicit understanding developed because sex traffickers, including L.M.H.'s, frequently used the St. Louis Property for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Wyndham Defendants and Franchisee that created a favorable environment for sex trafficking to flourish.

100. Both the Wyndham Defendants and Franchisee participated in this venture by acting jointly to rent rooms to traffickers and to operate the hotel in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, Franchisee provided "boots on the ground" at the hotel, and the Wyndham Defendants played a primary role

41

in renting rooms at the St. Louis Property and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

101.    The Wyndham Defendants and Franchisee participated in the venture by continuing to rent rooms to traffickers, including L.M.H.'s, after they knew or should have known that victims like Jane Doe L.M.H. were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select the St. Louis Property as a venue for their illegal activities.

102.    Wyndham Defendants and Franchisee did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

   a. The population of traffickers, including L.M.H.'s, that were familiar to the staff at the St. Louis Property;

   b. These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the St. Louis Property but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

   c. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

   d. Defendants provided additional services to traffickers (including L.M.H.'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

103.    The criminal traffickers operating at the St. Louis Property as part of Venture 1 violated 18 U.S.C. §1591 as to victims including L.M.H.

42

104.    If Wyndham Defendants and Franchisee had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from L.M.H.'s trafficking at the St. Louis Property.

105.    In ways described more fully above, the Wyndham Defendants and Franchisee also knowingly received a financial benefit from participating in a commercial hotel-operating venture at the St. Louis Property (hereinafter "Venture 2").

106.    The Wyndham Defendants and Franchisee had a longstanding business relationship pursuant to which they jointly participated in operation of the St. Louis Property with a shared goal of maximizing revenue, including gross room revenue.

107.    The Wyndham Defendants and Franchisee, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at the St. Louis Property by continuing to operate the hotel in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at this hotel.

108.    Venture 2 was engaged in a violation of the TVRPA through the widespread sex trafficking at the St. Louis Property, which resulted in L.M.H. and other victims being harbored, maintained, and provided in the rooms of the St. Louis Property. Venture 2 also engaged in a violation of the TVPRA through the actions of Franchisee who violated the TVPRA as a perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

109.    Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Wyndham Defendants and Franchisee participated in the venture by continuing to operate the St. Louis Property in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the

trafficking of L.M.H. The Wyndham Defendants continued Franchisee with operational support, use of trademarks, marketing services, and other resources to operate the St. Louis Property in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

## VI. Franchisee Defendant and the Staff at the St. Louis Property Acted as Actual Agents of Wyndham.

110. Wyndham is vicariously liable for the acts, omissions, and knowledge of Wyndham and staff at the St. Louis Property, which are Wyndham's actual agents or subagents.

111. The Wyndham Defendants subjected the Franchisee Defendant to detailed standards and requirements regarding the operation of the St. Louis Property through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Defendants.

112. The Wyndham Defendants obscure the full extent of control they exercise over the franchisee by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Wyndham Defendants imposed on the franchisee:

    a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used; and

    b. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

    c. dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions; and

    d. significantly exceeded what was necessary for Wyndham to protect its registered trademarks.

44

113.    In addition to the ways described above, upon information and belief, Wyndham exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the St. Louis Property, including the following ways:

a.  Wyndham required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham to protect its registered trademarks;

b.  Wyndham maintained a team of regionally based trainers to provide training at branded hotels. Wyndham provided training for hotel management and select hotel staff on-site and at locations selected by Wyndham;

c.  Wyndham provided hotels staff with training it created through an online learning platform, Wyndham University, it controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d.  Wyndham controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e.  Wyndham retained sole discretion to determine whether all training had been completed satisfactorily;

f.  Wyndham maintained oversight in hiring, disciplining, and terminating hotel management and employees;

g.  Wyndham required franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

h.  For certain products and services that franchisee was required to purchase to operate the property, Wyndham designated approved vendors and prohibited franchisee from purchasing goods and services from anyone other than an approved vendor;

i.  Wyndham required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

j.  Wyndham set required staffing levels for the St. Louis Property;

45

k.  Wyndham established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

l.  Wyndham set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

m.  Wyndham provided benefits for employees of franchised hotels;

n.  Wyndham controlled channels for guests to report complaints or provide feedback regarding the St. Louis Property and directly participated in the response and/or supervised the response to customer complaints or other feedback. Wyndham retained the right to provide refunds or other compensation to guests and to required Franchisee Defendant to pay associated costs;

o.  Wyndham generated reports and analysis of guest complaints and online reviews for the St. Louis property;

p.  Wyndham set detailed requirements for insurance that Franchisee Defendant must purchase;

q.  Wyndham exercised or retained control over the franchisee's day-to-day accounting and banking practices;

r.  Wyndham regularly audited the books and records of Franchisee Defendant;

s.  Wyndham conducted frequent and unscheduled inspections of the St. Louis Property;

t.  Wyndham retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if franchisee violated any of Wyndham's detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject properties;

u.  Wyndham controlled all marketing for the St. Louis Property, directly provided marketing services, and prohibited Franchisee Defendant from maintaining any online presence unless specifically reviewed and approved by Wyndham;

v.  Wyndham exercised or retained control over all aspects of building and facility design;

w.  Wyndham imposed detailed recordkeeping and reporting requirements on Franchisee Defendant regarding virtually all aspects of hotel operations;

46

x. Wyndham supervised and controlled day-to-day operations of the St. Louis Property through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee Defendant to use;

y. Wyndham required the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis; and

z. Wyndham retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

114. Upon information and belief, Wyndham had the right to and did enforce its control over Franchisee Defendant through various methods, including:

a. the right to conduct detailed inspections of the St. Louis Property;

b. monitoring or auditing the Franchisee Defendant for compliance with policies and expectations;

c. directing Franchisee Defendant to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d. mandating training and education for franchisee and/or hotel staff;

e. employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f. the right to impose fines or penalties;

g. the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services; and

h. the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

## VII. Wyndham Defendants are jointly responsible for the trafficking of Jane Doe (L.M.H.)

115. All the Wyndham Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

47

116.   Upon information and belief, operation of the subject properties was part of a single unified operation by Wyndham Defendants. Upon information and belief, all Wyndham Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, Wyndham Defendants acted jointly to own, operate, control, manage, and supervise the St. Louis Property. As an integrated enterprise and/or joint venture, Defendants were separately and jointly responsible for compliance with all applicable laws.

## VIII.   Defendants are Jointly and Severally Liable for Jane Doe (L.M.H.)'s Damages.

117.   The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (L.M.H.).

118.   Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (L.M.H.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

<u>**CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA**</u>

119.   Jane Doe (L.M.H.) incorporates all other allegations.

**I.   Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee Defendant)**

120.    Jane Doe (L.M.H.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

121.   Franchisee Defendant is a perpetrator within the meaning of 18 U.S.C §1595(a) because it:

   a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe (L.M.H.)) knowing or in reckless disregard of the fact that the victims would be

48

caused, through force, coercion, or fraud, to engage in commercial sex acts while at the St. Louis Property.

b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at the St. Louis Property.

122. Violations of 18 U.S.C §1595(a) by the Franchisee Defendant as a "perpetrator" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (L.M.H.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendant's hotel property.

**II.    Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants)**

123. Jane Doe (L.M.H.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

124. L.M.H. is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

125. All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture the Defendants knew or should have known was engaged in a violation of the TVPRA.

126.    **Venture 1:** Through acts and omissions more fully described throughout this Complaint, each Defendant received a financial benefit from participating a venture with sex traffickers, including L.M.H.'s trafficker. Each Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

a.  Venture 1 resulted when Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the St. Louis Property by renting them hotel rooms and providing them related services despite the fact that each Defendant knew or should have known these traffickers were using the St. Louis Property to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of L.M.H.

b.  This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including L.M.H., in the rooms of the St. Louis Property.

c.  Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

d.  Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including L.M.H.'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including L.M.H.). Each Defendant received a financial benefit every time a trafficker rented a room.

e.  Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including L.M.H.'s trafficking).

127.    **Venture 2**: Through acts and omissions more fully described throughout this complaint, the Wyndham Defendants received a financial benefit from participating in Venture 2 with Franchisee Defendant operating the St. Louis Property. Each of the Wyndham Defendants violated the TVPRA through participation, as a beneficiary, in Venture 2 as follows:

a.  Venture 2 is a commercial venture that resulted from the business relationship between each Wyndham Defendant as franchisor for the St. Louis Property and Franchisee Defendant to operate the St. Louis Property with a common objective of maximizing revenue at the hotels, including gross room revenue.

b.  The venture violated the TVPRA through the widespread sex trafficking that occurred at the St. Louis Property, including the trafficking of L.M.H. This venture

also violated the TVPRA through the conduct of Franchisee, who violated 18 U.S.C §1591(a) as a perpetrator.

c. Each Wyndham Defendant, at the relevant time, knew or should have known Venture 2 was engaged in violations of the TVPRA.

d. Each Wyndham Defendant knowingly benefited from this venture through the management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the St. Louis Property, which increased every time a room was rented including rooms rented to traffickers.

e.  Each Wyndham Defendant, at the relevant time, participated in this venture by (1) continuing the ongoing business relationship with Franchisee despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

128. The ventures in which each Defendant participated were a direct, producing, and proximate cause of the injuries and damages to L.M.H.

### III.    Cause of Action: Liability under 18 U.S.C. § 2255

129. While a minor, Plaintiff was a victim under 18 U.S.C. §1591 and is thus entitled to bring a civil action under 18 U.S.C. § 2255.

130. Franchisee Defendant is liable to Plaintiff under 18 U.S.C. § 2255 because, as alleged above, Franchisee Defendant is a perpetrator under 18 U.S.C. §1591.

131. Each of the Defendants are liable to Plaintiff under 18 U.S.C. § 2255 because, as alleged above, each Defendant is liable as a beneficiary under 18 U.S.C. §1595(a).

### IV.    Cause of Action: Vicarious Liability for Violations of TVPRA and § 2255 (Wyndham Defendants)

132. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

133.    Under the TVPRA and the federal common law, an entity vicariously liable for the acts and omissions of its alter-egos.

134.    Franchisee Defendant acted as the actual agent of Wyndham Defendants when operating the St. Louis Property.

135.    Through the acts and omissions described throughout this Complaint, Wyndham Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate its hotel property.

136.    Wyndham Defendants are vicariously liable for the TVPRA violations of its franchisee and the subagents of that franchisee.

137.    Additionally, on information and belief, each of the Wyndham Defendants participated in a joint venture. They had highly integrated operations at the hotels, shared revenue and profits generated from the hotels, and exercised mutual control over the venture at the hotels. They functioned as a single integrated entity and/or as alter-egos of one another.

## **DISCOVERY RULE**

138.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (L.M.H.) invokes the discovery rule. At the time she was harmed and through at least 2017, Jane Doe (L.M.H.) was under coercion and control of her trafficker who abused and manipulated her. Thus, Jane Doe (L.M.H.) did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her trafficker, Jane Doe (L.M.H.) —through no fault of her own—lacked the information to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of L.M.H. being kept under the control of her traffickers, which Defendants facilitated.

139.    At the time Jane Doe (L.M.H.) was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendants' hotel or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

140.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (L.M.H.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (L.M.H.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (L.M.H.) filed this lawsuit.

141.    As a result of her continuous trafficking at the St. Louis Property through at least 2017, Jane Doe (L.M.H.) was beaten, drugged, sexually assaulted, and mentally abused. She lacked the mental capacity to recognize the extent and scope of her injuries or those responsible particularly those who financially benefited from her trafficking but may not have been seen to be directly involved.

142.    Jane Doe (L.M.H.) was under the continuous control of her traffickers through at least 2017. As a result, she did not have the freedom to investigate her claims, to identify those responsible or to seek legal representation necessary to pursue her legal rights.

143.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (L.M.H.) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

144.    Jane Doe (L.M.H.) was subject to continuous trafficking at the subject properties through at least 2017, which is not more than 10 years before Jane Doe (L.M.H.) filed this lawsuit.

53

145.    This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the St. Louis Property and Defendants' ongoing venture with one another and with criminal traffickers.

## DAMAGES

146.    Defendants' acts and omissions, individually and collectively, caused Jane Doe (L.M.H.) to sustain legal damages.

147.    Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (L.M.H.).

148.    Jane Doe (L.M.H.) is entitled to be compensated for personal injuries and economic damages, including:

   a.   Actual damages (until trial and in the future)

   b.   Incidental and consequential damages (until trial and in the future);

   c.   Mental anguish and emotional distress damages (until trial and in the future);

   d.   Lost earnings and lost earning capacity (until trial and in the future);

   e.   Necessary medical expenses (until trial and in the future);

   f.   Life care expenses (until trial and in the future);

   g.   Physical pain and suffering (until trial and in the future);

   h.   Physical impairment (until trial and in the future);

   i.   Exemplary/Punitive damages;

   j.   Attorneys' fees; and

   k.   Costs of this action.

   l.   Pre-judgment and all other interest recoverable.

## JURY TRIAL

149.    Jane Doe (L.M.H.) demands a jury trial on all issues.

## RELIEF SOUGHT

150.    WHEREFORE, Jane Doe (L.M.H.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (L.M.H.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (L.M.H.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

Dated October 21, 2025                **THE LOCKS LAW FIRM**

*/s/ Francesca A. Iacovangelo*
Francesca A. Iacovangelo, Esq.
601 Walnut Street, Suite 720 E
Philadelphia, PA 19106
(215) 893-3454
(215) 893-3444 Facsimile
fiacovangelo@lockslaw.com

**ATTORNEYS FOR PLAINTIFF**